***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award. The Full Commission AFFIRMS with modifications the Opinion and Award of the Deputy Commissioner.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. North Carolina Industrial Commission has jurisdiction in this matter.
3. An employee-employer relationship existed between the parties at all relevant times.
3. AIMCO was the carrier on the risk for defendant-employer at the time of plaintiff's injury.
4. Key Risk Management Services was the third-party administrator of workers' compensation insurance.
5. Plaintiff sustained injuries to his left ankle, right knee, and left shoulder on October 19, 2004, in the course of his employment with defendant-employer.
6. Defendants accepted plaintiff's claim as compensable by filing a Form 60, dated October 29, 2004, and have paid all appropriate medical and indemnity benefits.
7. Plaintiff's average weekly wage was $605.17, yielding a compensation rate of $403.47.
8. Stipulated Exhibit 1, consisting of North Carolina Industrial Commission forms, motions, Orders, medical records and vocational rehabilitation records, is part of the evidence of record.
 *********** ISSUES *Page 3 
1. What are plaintiff's work restrictions from his October 19, 2004 injury;
2. Whether vocational rehabilitation through VocMed, Inc., applied the appropriate restrictions when considering employment opportunities for plaintiff and whether plaintiff was compliant with vocational rehabilitation and diligent in seeking employment; and
3. Whether plaintiff remains disabled as a result of his injury on October 19, 2004.
 ***********
Based upon the competent, credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty years old. Plaintiff completed high school, law enforcement courses, and courses in fire and rescue training. Plaintiff has been involved as a volunteer firefighter for more than 21 years.
2. On October 19, 2004, plaintiff fell when jumping down an embankment onto a cement slab, while pursuing a suspect in the course of his employment as a police officer for the Town of Forest City, North Carolina. Plaintiff sustained a left ankle comminuted fracture, a fracture of the right tibial plateau, and dislocation of his left shoulder.
3. Plaintiff initially treated at Rutherford Hospital with Dr. Harry Rudolph, an orthopaedic surgeon, who is also with Rutherford Orthopaedics. Dr. Rudolph performed multiple surgeries on plaintiff during 2004 and 2005 and eventually referred him to Dr. Robert Anderson at OrthoCarolina for a second opinion on treatment options. Dr. Anderson performed surgeries on plaintiff in 2005 and 2006 and referred plaintiff to a plastic surgeon, Dr. Wesley Bean, in 2005 due to a wound not healing. Dr. Bean then performed surgery on plaintiff on October 25, 2005. *Page 4 
4. The Full Commission places greater weight on the medical records, and finds plaintiff underwent seven surgeries and finds that plaintiff's testimony of undergoing 19 surgeries and two fusions on his ankle is not credible.
5. Dr. Anderson continued to follow plaintiff and at his June 15, 2006 visit, Dr. Anderson noted plaintiff was extremely depressed due to multiple surgical interventions and Dr. Anderson recommended mental health treatment be initiated.
6. Dr. Anderson cleared plaintiff for physical therapy in July, 2006, but noted he was not ready for any job related activities at that time.
7. In July 2006, plaintiff began treating with Dr. Terence Fitzgerald, a psychologist with the Center for Occupations Rehabilitation, for chronic pain syndrome and psychological issues. Plaintiff treated with Dr. Fitzgerald from July 19, 2006 to October 18, 2007. Dr. Fitzgerald diagnosed plaintiff with somatoform pain disorder of unknown etiology and major depressive episode, secondary to the work injury and resulting surgeries. Dr. Fitzgerald recommended stress and pain management training and referred plaintiff to Dr. Richard Broadhurst.
8. In July, 2006, plaintiff began treating with Dr. Broadhurst, an occupational specialist with the Center for Occupational Rehabilitation. Plaintiff participated in a work hardening program and physical therapy from October 2006 to January 2007, following which he completed a functional capacity evaluation (FCE).
9. On December 12, 2006, plaintiff saw Dr. Rudolph, who opined that plaintiff had reached maximum medical improvement for his ankle and knee. On December 29, 2006 Dr. Rudolph assigned the following impairment ratings: 12% to the right knee, 9% to the left shoulder, and 10% to the left foot. However, Dr. Rudolph deferred to Dr. Anderson for the ankle *Page 5 
fusion rating, as he believed that would be the majority of plaintiff's disability. On January 18, 2007 Dr. Anderson assigned a 40% impairment rating to plaintiff's left foot for the ankle fusion.
10. Plaintiff's FCE, completed on January 22, 2007, assigned the following restrictions of overall medium/heavy duty: light/medium overhead lifting (25 pounds occasionally, 15 pounds frequently); heavy lifting floor to knuckle knuckle to shoulder (100 pounds occasionally, 50 pounds frequently); medium pushing/pulling (40 pounds occasionally, 25 pounds frequently, which was the cart's maximum capacity); and heavy carrying (100 pounds occasionally, 50 pounds frequently).
11. On January 25, 2007, plaintiff was discharged from the Center for Occupational Rehabilitation program. Plaintiff's permanent restrictions from Dr. Broadhurst at that time included: medium to heavy jobs or less; overhead lifting of no more than 25 pounds occasionally and 15 pounds frequently; pushing/pulling with no more than 40 pounds of force occasionally and 25 pounds of force frequently (equivalent to 400-pound and 250-pound objects respectively); avoiding excessive ladder climbing and climbing only on flat rungs; avoiding excessive walking on inclines; and avoiding excessive crouching and bending.
12. Dr. Rudolph's assigned work restrictions included standing or walking for up to three hours per shift but no more than one hour at a time, no running, no walking on uneven terrain, no climbing or squatting, no risk of altercation and no jumping in or out of a truck.
13. Dr. Anderson's assigned work restrictions included light to medium duty and intermittent walking and standing.
14. Neither Dr. Rudolph, Dr. Anderson, nor Dr. Broadhurst recommends any further treatment at this time for plaintiff's injuries. *Page 6 
15. Taking the restrictions assigned by Dr. Rudolph, Dr. Anderson, Dr. Broadhurst, and the FCE into consideration, the Full Commission finds plaintiff's work restrictions to be as follows: standing or walking for up to three hours per shift; no running; no walking on uneven terrain; overhead lifting of no more than 25 pounds occasionally and 15 pounds frequently; pushing/pulling with no more than 40 pounds of force occasionally and 25 pounds of force frequently (equivalent to 400-pound and 250-pound objects respectively); carrying no more than 100 pounds occasionally and 50 pounds frequently; avoidance of excessive ladder climbing, excessive walking on inclines, and excessive crouching and bending; no jumping on and off trucks; and having no risk of altercation.
16. The Full Commission finds that based on plaintiff's restrictions, the vocational rehabilitation provided by VocMed was appropriately cognizant of plaintiff's restrictions and included suitable employment.
17. On March 13, 2007, plaintiff returned to Dr. Rudolph for continued shoulder pain and to discuss surgery. Plaintiff again returned on March 22, 2007 for a pain medication refill and was instructed to seek additional medications and treatment from his primary care doctor, Dr. Seema Daigle at Rutherford Internal Medicine.
18. On May 9, 2007 plaintiff saw Dr. Daigle, due to moderate to severe pain in his left foot aggravated by movement or prolonged standing or climbing. Dr. Daigle prescribed Flexeril, Lyrica and Vicodin. Dr. Daigle also prescribed Cymbalta and Ambien for the depression and insomnia plaintiff reported.
19. On September 12, 2007, plaintiff returned to Dr. Fitzgerald reporting increased anxiety. At plaintiff's follow up visit on October 7, 2007, Dr. Fitzgerald noted plaintiff had experienced marked improvement in coping and general satisfaction. *Page 7 
20. On October 18, 2007, Dr. Fitzgerald indicated plaintiff was at maximum medical psychological improvement for the work injury and discharged plaintiff by mutual consent.
21. Plaintiff saw Dr. Daigle on February 29, 2008 and May 2, 2008 with complaints of foot pain aggravated by activity, but indicated his depression was better. Plaintiff reported he still felt tired and worthless. Dr. Daigle continued pain and depression medications.
22. On April 6, 2008 Dr. Rudolph opined plaintiff could stand or walk one hour continuously and about two hours in an eight hour period. He also stated plaintiff could bend, kneel, crawl occasionally but could not do any climbing. On November 17, 2008 at plaintiff's annual check up, Dr. Rudolph indicated plaintiff was limited to no more than three hours on his feet, and did not recommend long periods of walking.
23. Plaintiff began telling his vocational counselor he had post traumatic stress disorder (PTSD) nearly one year before plaintiff received any diagnosis of PTSD and over one year after the compensable injury by accident. On March 23, 2009, plaintiff began treating with Dr. Terry Ledford, a psychologist chosen by plaintiff, for mental health counseling. On June 9, 2009, Dr. Ledford diagnosed plaintiff with PTSD, one month prior to the hearing before the Deputy Commissioner. Dr. Ledford's diagnosis was based on plaintiff's self-report and his responses on the Burns Post-Traumatic Stress Disorder Inventory, a list of ten symptoms that plaintiff ranked. Dr. Ledford admitted that the Burns Post-Traumatic Stress Disorder Inventory is entirely based on self-report and contains no validity measures.
24. Dr. Fitzgerald had never heard of the Burns Post-Traumatic Stress Disorder Inventory. Dr. Fitzgerald indicated plaintiff never met the diagnostic criteria for PTSD during the extended period he treated plaintiff, which was close in time to the date of plaintiff's injury by accident. Dr. Fitzgerald performed testing, which involved reenacting an enriched narrative *Page 8 
of plaintiff's injury. Plaintiff demonstrated minimal, if any psychophysiologic response, further ruling out a PTSD diagnosis. Dr. Broadhurst also agreed that plaintiff did not demonstrate signs of PTSD.
25. Dr. Fitzgerald and Dr. Ledford both agreed it is extremely rare for a person to develop PTSD one year after a traumatic event.
26. Plaintiff's testimony regarding PTSD is not credible, as plaintiff self-diagnosed himself with PTSD long before he was ever psychologically diagnosed. Plaintiff conveyed this diagnosis to his vocational counselor, seemingly for the purpose of avoiding job leads. Plaintiff was not diagnosed with PTSD until one month before the Deputy Commissioner's hearing by a psychologist that he chose. Plaintiff failed to demonstrate PTSD in more than one year of treatment with Dr. Fitzgerald and Dr. Broadhurst, despite the fact that Dr. Fitzgerald actively sought to elicit such symptoms in order to ascertain whether plaintiff had PTSD.
27. The Full Commission assigns greater weight to the testimony of Dr. Fitzgerald, who treated plaintiff both closer in time to the injury by accident and for a longer period of time than Dr. Ledford. The Full Commission finds plaintiff does not suffer from PTSD and therefore PTSD is not a valid basis for disqualifying otherwise suitable job leads for plaintiff. These employment opportunities include, but are not limited to, positions in law enforcement, dispatch, and security positions.
28. The Full Commission further finds that taking into consideration plaintiff's physical and mental conditions, it was reasonable for vocational efforts to have included job leads in law enforcement, security, and dispatch positions and these were suitable employment opportunities. *Page 9 
29. Plaintiff has a high school education, continuing education courses at Isothermal Community College and McDowell Technical College on various fire and rescue topics, continuing education courses in basic computer and keyboarding skills, Microsoft Word and Excel, and numerous certifications including but not limited to his EMT Basic certification, Emergency Medical Responder certification, Basic Law Enforcement Certification along with certificates in accident investigation and reconstruction, drug enforcement, responding to hazardous materials, narcotics identification, helicopter safety and landing operations, and terrorism awareness. Plaintiff has been involved in public safety for more than 21 years, including over 14 years in law enforcement. Plaintiff also has his Commercial Driver's License (CDL). Plaintiff possesses extensive valuable training and certifications.
30. Since February 2006, defendants have provided plaintiff with vocational assistance through VocMed. Initially, plaintiff worked with vocational counselors Joseph Yurchak and Robert Cox, and recently plaintiff has worked with Amy Smith. However, for the majority of the time from May 2007 to April 2009, plaintiff worked with vocational counselor Brian Bernas. Mr. Bernas meets the requirements for a qualified rehabilitation professional under Rule IV of the North Carolina Industrial Commission Rules for Utilization of Rehabilitation Professionals in Workers' Compensation Claims, and has been providing vocational assistance to individuals for 17 years.
31. Mr. Bernas stated that plaintiff was among his most employable clients due to plaintiff's education, experience, stable work history, and transferable skills. Mr. Bernas described plaintiff as personable and noted plaintiff had no trouble communicating. Mr. Bernas referred to plaintiff as "a sought after candidate" because of his law enforcement background. *Page 10 
32. Mr. Bernas identified multiple job leads for plaintiff, but plaintiff was not offered employment. Mr. Bernas indicated there was rarely a week when he was not able to identify any job leads for plaintiff and he usually found multiple leads. Mr. Bernas expressed surprise that plaintiff had not been offered a job and stated, "I've asked myself that question many times, why hasn't he secured employment."
33. Plaintiff possesses a Commercial Driver's License and is physically capable of employment as a truck driver. Dr. Rudolph opined plaintiff could drive a truck as long as he did not have to unload it or jump in and out of the truck. Dr. Rudolph stated that using a step 16 inches off the ground to climb into and out of the truck would be fine for plaintiff. Dr. Broadhurst opined that plaintiff could drive a truck as long as it was within medium duty requirements and did not require plaintiff to climb on round rungs to get into the truck. Dr. Rudolph and Dr. Broadhurst also opined and the Full Commission finds that plaintiff is physically capable of employment as dispatcher.
34. Mr. Bernas identified numerous suitable jobs for plaintiff. A limited list includes the following:
 a. Assistant Security Director at Asheville Mall: This job lead was provided on 10/26/07. Timothy Cochran, the Security Director at Asheville Mall, was a former police officer and was interested in plaintiff because of his prior police experience. Mr. Cochran stated that plaintiff's physical restrictions would not be a problem. Mr. Cochran called plaintiff twice, and plaintiff did not return his calls, so the position was filled. Nevertheless, Mr. Cochran encouraged plaintiff to submit a resumé to his corporate office for other opportunities. Salary for persons with plaintiff's *Page 11 
experience as an Assistant Security Director is $16.39 to $17.77 per hour, which would have been more than plaintiff earned prior to his injury.
 b. Patrol Telecommunicator for the North Carolina Department of Crime Control and Public Safety: This job lead was provided on 11/7/07. The salary range was $28,402 — $44,121. Plaintiff could potentially have earned much more than his pre-injury wages.
 c. Telecommunicator for the City of Morganton Department of Public Safety: This job lead was provided on 12/5/07. The job duties would have included providing dispatching for Police/Fire operations and Utility Service and directing calls to the appropriate emergency response agency. The salary range was $25,074 — $37,611. Plaintiff could potentially have earned more than his pre-injury wages.
 d. Telecommunicator for City of Morganton: This job lead was provided on 1/9/08. The job duties would have included dispatching Police/Fire operations and Utility Service and directing calls to the appropriate emergency response agency. The salary range increased from the prior job posting to $25,827 — $38,741, again having the potential to pay plaintiff more than his pre-injury wages. Plaintiff was encouraged to submit his application because when telecommunicators are out sick, police officers fill this position, so plaintiff would have been a good candidate.
 e. Buncombe County Sheriff's Dispatcher: This job lead was provided on 1/11/08. The job duties would include taking 911 calls, dispatching officers, maintaining contact with units, and monitoring public safety *Page 12 
radio frequencies. The salary range was $26,652 — $29,467, which is 85% to 94% of plaintiff's pre-injury wage.
 f. Assistant Security Director at Asheville Mall: This job lead was provided on 2/5/08. This position became available again, and the Security Director, Tim Cochran, strongly encouraged plaintiff to submit a job application. Mr. Cochran was a former police officer and was very interested in plaintiff because of his law enforcement background. Mr. Cochran stated that plaintiff's physical restrictions would not be a problem. Salary for persons with plaintiff's experience as an Assistant Security Director is $16.39 to $17.77 per hour, which would have been more than plaintiff earned prior to his injury.
 g. Biltmore Estates Security Manager: This job lead was provided on 2/6/08. Plaintiff was encouraged to submit his application because of his law enforcement background. The minimum salary was $40,000, which would have significantly exceeded plaintiff's pre-injury wage. The majority of the job duties would have consisted of desk work, hiring new security guards, and supervising the current staff.
 h. Patrol Telecommunicator for the North Carolina Department of Crime Control and Public Safety: This job lead was provided on 5/13/08. The salary range was from $28,402 — $44,121. Plaintiff could potentially have earned more than his pre-injury wage. *Page 13 
 i. CCPS Highway Patrol Telecommunicator: This job lead was provided on 7/15/08. The salary range was from $28,703 — $44,121. Plaintiff had the potential to earn much more than his pre-injury wage.
 j. Telecommunicator for the City of Morganton: This job lead was provided on 7/18/08. Plaintiff was encouraged to submit his application. The starting salary was $25,826, 82% of plaintiff's pre-injury wage.
 k. Patrol Telecommunicator: North Carolina Department of Crime Control and Public Safety: This job lead was provided on 9/25/08. The salary range was from $29,502 — $45,334. Plaintiff could have potentially earned more than his pre-injury wages.
 l. Buncombe County Sheriff's Dispatcher: This job lead was provided on 8/20/08. Salary range was $27,745 to $30,675. This is between 88% to 97% of plaintiff's pre-injury wages.
 m. Telecommunicator for the City of Asheville: This job lead was provided on 9/19/08. The job paid $13.86 per hour, which would have been 92% of plaintiff's pre-injury wages.
 n. Public Safety Supervisor/Police Chief for the JFK Alcohol and Drug Abuse Treatment Center: This job lead was provided on 12/4/08. The job duties would have included working with other law enforcement groups to implement joint operations; scheduling, planning, and supervising activities; interpreting and supervising enforcement of policies; analyzing problems related to law enforcement and security; reviewing/evaluating activity reports of officers; administering budget and personnel policies; *Page 14 
and supervising training for the program. The job required a high school diploma and three years of law enforcement experience, which plaintiff possessed. The salary range was from $49,010 to $59,422. Plaintiff could have earned substantially more than his pre-injury wage.
 o. Patrol Telecommunicator for the North Carolina Department of Crime Control and Public Safety: This job lead was provided on 12/17/08. The salary range was $29,502 — $45,334. Plaintiff could have potentially earned much more than his pre-injury wages.
 p. Buncombe County Sheriff's Dispatcher: This job lead was provided on 12/24/08. The salary range was $27,745 to $30,675, which would have been 88% to 97% of plaintiff's pre-injury wages.
 q. Telecommunicator for the City of Asheville: This job lead was provided on 12/24/08. The job paid $13.86 per hour, which would have been 92% of plaintiff's pre-injury wages.
 r. McDowell County Emergency Medical Dispatch Telecommunicator: This job lead was provided on 1/15/09. Salary information was unavailable, but the Full Commission finds it is reasonable to conclude the salary would have been in the same range as other dispatcher positions identified for plaintiff. Plaintiff would have been an ideal candidate given his EMT certification, volunteer activities with the McDowell County Rescue Squad, and knowledge of the area through his volunteering with both the Rescue Squad and Volunteer Fire Department. *Page 15 
 s. Patrol Telecommunicator for the North Carolina Department of Crime Control and Public Safety: This job lead was provided on 2/12/09. The salary range was $29,502 — $45,334. Plaintiff could have potentially earned much more than his pre-injury wages.
 t. EMS Communications Specialist at Mission Hospital: This job lead was provided 8/29/09. The job duties would have been to receive ground and air ambulance transport requests, coordinate the appropriate mode of transport, and communicate this information. The hourly wage range was from $13.19 to $20.44. Plaintiff could have earned more than his pre-injury wage.
35. Plaintiff did not receive offers for any of the 20 jobs listed above. Although plaintiff's physicians expressed concerns about plaintiff's ability to perform security jobs due to his inability to run or subdue anyone, the doctors agreed that the suitability of security jobs depended on the particular job duties. Mr. Bernas testified that he screened the security jobs and if they required duties outside plaintiff's restrictions, those leads were removed from consideration. Plaintiff interviewed for the Patrol Telecommunicator position at the North Carolina Department of Crime Control and Public Safety, but was not offered a job because he did not adequately describe his skills and abilities as well as other candidates. The people in charge of hiring at both Asheville Mall and Biltmore Estates expressed great interest in plaintiff and made an extra effort to get in touch with plaintiff. Plaintiff did not return their calls.
36. Mr. Bernas opined and the Full Commission finds that he has presented plaintiff with suitable employment opportunities that plaintiff is capable of obtaining, if he diligently *Page 16 
sought to obtain them. Vocational rehabilitation has provided several hundred job leads to plaintiff.
37. Plaintiff's stated career goal is to be an emergency medical technician (EMT) or an instructor in EMT, fire, or rescue classes. An EMT position is not suitable employment because the job duties are outside plaintiff's physical restrictions. To be an instructor for EMT, fire, or rescue classes at any of the five community colleges in plaintiff's area, a person must be able to perform and maintain the physical requirements of the jobs for which they are training others. Therefore, a position as an instructor for EMT, fire, or rescue classes is outside plaintiff's physical restrictions as well.
38. Plaintiff completed and passed his EMT Basic course in the Spring 2007 semester and had completed the classroom portion of the EMT Intermediate course at the time of the hearing in this matter. Plaintiff has volunteered with the McDowell County Rescue Squad for several years in hopes of positioning himself to be considered for a job as an EMT, but he has not obtained a job as an EMT.
39. The Full Commission finds by the greater weight of the evidence that plaintiff's focus on returning to work as an EMT had a negative impact on his motivation to return to work in suitable jobs identified by vocational rehabilitation.
40. Plaintiff is receiving two-thirds of his pre-injury wage in workers' compensation benefits along with half of his pre-injury wage in State disability retirement benefits. Plaintiff is receiving 117% of his pre-injury wages in total disability benefits. At the hearing before the Deputy Commissioner, plaintiff denied that receipt of these benefits had a negative impact on his motivation to return to work. The Full Commission does not find plaintiff's testimony credible concerning his motivation to return to work. *Page 17 
41. Dr. Fitzgerald's records and testimony, Dr. Broadhurst's records and testimony, Mr. Bernas' records and testimony, and the records of Mr. Cox, plaintiff's prior vocational counselor, contain numerous references to plaintiff's concern about losing his State disability retirement benefits. Plaintiff specifically expressed a wish to return to work only if he earned less than $19,000 per year, so he would not lose his State disability retirement benefits. When being considered for a potential EMT position at McDowell County Rescue Squad, plaintiff asked whether he could earn less than the standard salary for an EMT, as he did not want to lose his State disability retirement benefits. During the hearing before the Deputy Commissioner, plaintiff claimed to not remember making this request, but his comments are well-documented in the vocational records and corroborated by Mr. Bernas' testimony.
42. There is a reasonable likelihood that plaintiff would have been hired for any of the 20 suitable job leads identified above if he had diligently sought the jobs. The greater weight of the evidence of record shows that plaintiff did not diligently seek the employment identified by vocational rehabilitation because such employment would have deviated from his own plan of returning to a job outside his restrictions as an EMT and would have paid him more than $19,000, therefore potentially jeopardizing his State disability retirement benefits.
43. Plaintiff has not been fully compliant with vocational rehabilitation, as evidenced by his failure to submit applications for multiple job leads, his attachment of his restrictions to his resumé, his failure to obtain a Career Readiness Certificate (CRC) in over two years, despite repeated reminders and encouragement from his vocational counselors, and his refusal to return phone calls of potential employers. If plaintiff were to obtain his CRC, that qualification would give him preference in the hiring process. *Page 18 
44. The Full Commission finds that defendants identified many job opportunities beginning on October 26, 2007, that were within plaintiff's restrictions and that were suitable for plaintiff and would restore his pre-injury wage earning capacity. Therefore, as of October 26, 2007, defendants met their burden of proving plaintiff had wage earning capacity and was no longer disabled.
45. Plaintiff retains permanent partial impairment ratings of 12% to the right knee, 9% to the left shoulder, and 40% to the left foot. The Full Commission gives greater weight to the rating for the left foot injury assigned by Dr. Anderson than the rating assigned by Dr. Rudolph, as Dr. Rudolph deferred to Dr. Anderson.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On October 19, 2004 plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer which resulted in injuries to plaintiff's left ankle, right knee and left shoulder. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has the burden of proving disability, defined as a loss of wage earning capacity. Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). "Disability" is the "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." N.C. Gen. Stat. § 97-2(9).
3. In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury.Hilliard v. Apex Cabinet Co., *Page 19 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution, supra.
4. In this case plaintiff met his initial burden of showing that he is capable of some work and arguably made reasonable efforts to obtain employment although he was not fully compliant with vocational rehabilitation efforts. Demery v. Perdue Farms,Inc., supra. When a plaintiff meets his burden of showing disability, the burden then shifts to defendant to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms,Inc., supra. "An employer need not show that the employee was specifically offered a job by some other employer in order to prove that the employee was capable of obtaining suitable employment."Johnson v. Southern Tire Sales Serv.,358 N.C. 701, 709, 599 S.E.2d 508, 514 (2004) (internal citations omitted). The analysis is whether an employee is capable of getting a suitable job when "there exists a reasonable likelihood . . . that he would be hired if he diligently sought the job." Id. *Page 20 
5. Defendants have provided sufficient evidence proving that suitable jobs are available for plaintiff and that plaintiff is capable of obtaining a suitable job, taking into account plaintiff's physical, mental and vocational limitations. Demery v. PerdueFarms, Inc., supra.
6. Vocational rehabilitation has identified at least twenty job leads that constitute "suitable employment" because the positions are reasonably attainable for plaintiff; would pay him wages either greater than or as near as practicable to his pre-injury wages; and are well-suited for plaintiff in light of his age, education, work experience, physical capacities, mental capacities, vocational interests and aptitudes. Rule III(G), North Carolina Industrial Commission Rules for Utilization of Rehabilitation Professionals in Workers' Compensation Claims.
7. There is a reasonable likelihood that plaintiff would have been hired for any of the 20 identified suitable job leads if he had diligently sought the jobs. Id.
8. Plaintiff failed to present sufficient evidence contesting the suitability or availability of the jobs identified by defendants and failed to establish that he has reasonably sought the employment opportunities located by defendants. Franklin v. BroyhillFurniture Industries,123 N.C. App. 200, 472 S.E.2d 382, cert. denied,344 N.C. 629, 477 S.E.2d 39 (1996). Therefore, plaintiff was no longer totally disabled as a result of his compensable injury by accident as of October 26, 2007. N.C. Gen. Stat. § 97-2(9).
9. As the result of his compensable injury by accident, plaintiff is entitled to payment for permanent partial impairment ratings: 12% to his right knee, for which he is entitled to payment by defendants of permanent partial *Page 21 
disability compensation at the rate of $403.47 per week for 24 weeks; 9% to the left shoulder for which he is entitled to payment by defendants of permanent partial disability compensation at the rate of $403.47 per week for 21.6 weeks; and 40% to the left foot, for which he is entitled to payment by defendants of permanent partial disability compensation at the rate of $403.47 per week for 57.6 weeks, for a total of 103.2 weeks. N.C. Gen. Stat. §§ 97-31(13), (14), (15). Defendants are entitled to an offset for their overpayment of temporary total disability compensation to plaintiff after October 26, 2007.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 A W A R D
1. Defendants were entitled to terminate plaintiff's temporary total disability benefits effective October 26, 2007 and are entitled to an offset for their overpayment of temporary total disability compensation after October 26, 2007, against the permanent partial disability compensation owed plaintiff.
2. A reasonable attorney's fee in the amount of 25% is hereby approved to be deducted from sums due plaintiff, if any, and paid directly to plaintiff's counsel in one lump sum of the accrued amount.
3. Defendants shall continue to pay for all medical treatment incurred as a result of plaintiff's injury by accident on October 19, 2004 for so long as said treatment is necessary to effect a cure, give relief, or tends to lessen plaintiff's period of disability.
4. Defendants shall pay the costs, which include an expert witness fee of $600.00 to Dr. Rhett Rudolph and $400.00 to Dr. Terry Ledford, if not already paid by prior order.
This the ___ day of June, 2010.
 S/____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 22 
CONCURRING:
 S/____________________ BERNADINE S. BALLANCE COMMISSIONER
 S/____________________ DIANNE C. SELLERS COMMISSIONER *Page 1